UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
JEAN-PAUL FOUCHECOURT,

                                        Plaintiff,

                                                            Civ. No.: 07 CIV 3778 (DC)

            -against-

METROPOLITAN OPERA ASSOCIATION, INC.,
and FRANCO ZEFFIRELLI,
                                        Defendants.

-------------------------------------------------------------------X

---

**MEMORANDUM OF LAW IN OPPOSITION OF METROPOLITAN OPERA
ASSOCIATION, INC.'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT**

---

                              Budin, Reisman, Kupferberg & Bernstein, LLP
                              112 Madison Avenue
                              New York, New York 10016
                              (212) 696-5500

Gerard A. Connolly, Jr., Esq.

# TABLE OF CONTENTS

PRELIMINARY STATEMENT………………………………………………..…...….4

STATEMENT OF MATERIAL FACTS…………………………………………..…….4

RULE 12(B)(6): STANDARD OF REVIEW………………………………………….5

POINT I
THE WORKERS' COMPENSATION LAW WAS ENACTED
TO PROTECT THOSE INJURED ON THE JOB, NOT TO PRECLUDE
ONE FROM INSTITUTING AN ACTION AGAINST A NEGLIGENT EMPLOYER…………...6

POINT II
AT THE TIME OF THE ACCIDENT, PLAINTIFF WAS
ENGAGED BY THE METROPOLITAN OPERA ASSOCIATION, INC.
TO PERFORM IN A LIMITED NUMBER OF PRODUCTIONS,
ON A PER PERFORMANCE BASIS………………………………………………...….9

POINT III
THE EVIDENCE OF RECORD SUPPORTS A FINDING THAT
PLAINTIFF WAS IN FACT AN INDEPENDENT CONTRACTOR
AND NOT AN EMPLOYEE OF THE MET………………………………………………....10

POINT IV
THE INTENT OF THE WORKERS' COMPENSATION LAW
IS NOT TO PROTECT NEGLIGENT PERSONS FROM
CLAIMS BY SELF-EMPLOYED, STAR PERFORMERS,
SUCH AS MR. FOUCHECOURT………………………………………………………15

POINT V
PLAINTIFF DOES NOT FALL WITHIN THE DEFINITION OF
"EMPLOYEE" UNDER NEW YORK STATE'S WORKERS'
COMPENSATION LAW…………………………………………………………..17

CONCLUSION…………………………………………………………………....19

## TABLE OF AUTHORITIES

Aymes v. Bonelli, 980 F.2d 857 (2d Cir. 1992)......................................................13-14

Brass v. American Film Technologies, Inc., 987 F.2d 142, 150 (2d Cir. 1993).........................6

Cargo Partner AG v. Albatrans, Inc., 352 F.3d 41, 44 (2d Cir. 2003).................................5

Cubby, Inc. v. CompuServe, Inc., 776 F.Supp. 135, 142-143 (S.D.N.Y. 1991)......................10

Eisenberg v. Advance Relocation & Storage, Inc., 237 F.3d 111 (2d Cir. 2000)...........…..12, 14

Frankel v. Bally, Inc., 987 F.2d 86 (2d Cir. 1993)........................................…...….…10, 12

Hilton Int'l Co. v. NLRB, 690 F.2d 318 (2d Cir. 1982)...............................…......11-12

Jacobs v. Felix Bloch Erben Verlag fur Buhne Film und Funk KG,
160 F.Supp.2d 722 (S.D.N.Y. 2001)............................................................…....7

Keller v. Niskayuna Consol. Fire Dist. 1, 51 F.Supp.2d 223 (N.D.N.Y. 1999).................10, 12

Levitt v. Bear Stearns & Co., 340 F.3d 94, 101 (2d Cir. 2003)..........................................5

Liebowitz v. Cornell Univ., 445 F.3d 586, 591 (2d Cir. 2006)..........................................5

Lumbermens Mut Cas. Co. v. Banco Espanol de Credito, S.A.,
F.Supp.2d, 2006 WL 2987694 (S.D.N.Y. 2006)............................................…..................10

Matter of Di Carlo Inc., 234 A.D.2d 802, 651 N.Y.S.2d 248 (3rd Dept. 1996)......................…...7

Pilates, Inc. v. Current Concepts, Inc., 120 F.Supp.2d 286 (S.D.N.Y., 2000).........................7

Swierkiewicz v. Sorema, 534 U.S. 506, 512 (2002)...............................................…....5

Thompson v. Grumman Aerospace Corp., 78 N.Y.2d 553, 578 N.Y.S.2d 106 (1991)................6

Villager Pond, Inc. v. Town of Darien, 56 F.3d 375, 378 (2d Cir. 1995).............................…...5

Workers' Compensation Law § 2...........................................................................18

## PRELIMINARY STATEMENT

Plaintiff, JEAN-PAUL FOUCHECOURT, ("Fouchecourt") respectfully submits this memorandum of law in opposition to the instant application by defendant METROPOLITAN OPERA ASSOCIATION, INC. ("The Met"), for an Order dismissing plaintiff's complaint, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

As plaintiff sets forth below, plaintiff Fouchecourt is not barred from bringing an action against The Met as he was not, at any time, an employee of The Met, but rather, an independent contractor, performing services for The Met pursuant to a 'per performance contract'. As such, dismissal of his action against The Met would be improper, and defendant's motion must be denied in all respects.

## STATEMENT OF MATERIAL FACTS

This matter is brought upon an incident that occurred on October 22, 2005 when plaintiff, Jean-Paul Fouchecourt, was performing a role in the production of Guiseppe Verdi's "Falstaff" at the Metropolitan Opera House. While plaintiff was performing his duties upon the stage, he was caused to fall 10 feet from an upper platform portion of the set design and sustain serious and severe personal injuries as a result of the defendants' negligence, including but not limited to, the partial loss of vision in his left eye when he landed, striking his forehead on the stage below. No protection was placed behind or below the platform to prevent falls or otherwise protect the on-stage performers. A false wall had been created with a curtain at the back of the platform.

Plaintiff filed a Complaint and Jury Demand on May 14, 2007, requesting relief against THE MET and the set designer, defendant Franco Zeffirelli for their negligence, carelessness and recklessness in owning, operating, managing, maintaining and controlling the premises, and more particularly, the stage set and set design. It is plaintiff's position that defendants, *inter alia*, negligently allowed and permitted the stage, set, and set design to become and remain in a dangerous and unsafe condition and failing to provide proper and adequate protection for persons

4

performing on the stage, including plaintiff (A copy of plaintiff's Complaint and Jury Demand is annexed hereto as **EXHIBIT "A"**).

Defendant argues that plaintiff's action against The Met should be dismissed as it is barred by §11 and § 29(c) of the New York State Workers' Compensation Law. However, plaintiff will show that no employer-employee relationship existed between plaintiff and The Met at the time of the accident, or at any time prior to or subsequent to the accident. As such, his action is not barred by the New York State Workers' Compensation Law. Plaintiff will also show that the provisions of the law under which the Defendant argues there can be no cause of action do not apply to this Plaintiff.

## RULE 12(B)6: STANDARD OF REVIEW

A motion to dismiss under the Federal Rules of Civil Procedure Rule 12(b)(6) should be granted only where "it appears beyond a doubt that plaintiff can prove no set of facts in support of his claim that would entitle him to relief." Levitt v. Bear Stearns & Co., 340 F.3d 94, 101 (2d Cir. 2003). The complaint need only provide a "short and plain statement of the claim showing that the pleader is entitled to relief." Swierkiewicz v. Sorema, 534 U.S. 506, 512 (2002) (quoting Fed. R. Civ. P. 8 (a)(2)). Thus, a plaintiff is required only to give a defendant fair notice of what the claim is and the grounds upon which it rests." Liebowitz v. Cornell Univ., 445 F.3d 586, 591 (2d Cir. 2006).

In deciding a motion to dismiss, a court must liberally construe the claims, accept all factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff. E.g., Cargo Partner AG v. Albatrans, Inc., 352 F.3d 41, 44 (2d Cir. 2003). The Court's task "is merely to access the legal feasibility of the complaint, not to assay the weight of the

evidence which might be offered in support thereof." Levitt, 340 F.3d at 101. The issue is not

whether a plaintiff will ultimately prevail but whether he or she is entitled to offer evidence to

support the claims. See Villager Pond, Inc. v. Town of Darien, 56 F.3d 375, 378 (2d Cir. 1995).

The Court must limit itself to the facts alleged in the complaint, to any documents attached to the

complaint as exhibits or incorporated by reference therein, to matters of which judicial notice

may be taken, or to documents within plaintiff's possession or of which plaintiffs had knowledge

and relied upon in bringing suit. See Brass v. American Film Technologies, Inc., 987 F.2d 142,

150 (2d Cir. 1993).

### POINT I

### THE WORKERS' COMPENSATION LAW WAS ENACTED TO PROTECT THOSE INJURED ON THE JOB, NOT TO PRECLUDE ONE FROM INSTITUTING AN ACTION AGAINST A NEGLIGENT EMPLOYER.

Defendant The Met moves for dismissal of plaintiff's action on the ground the plaintiff's

exclusive remedy for his injury is worker's compensation benefits. See N.Y. Workers' Comp. Law

§ 11. However, the United States District Court for the Southern District of New York has

consistently held that, even if a plaintiff had received workers' compensation benefits on behalf of

defendant, he or she will not be precluded from bringing a separate negligence action against

defendant, if he or she can show that no employment relationship exists between plaintiff and

defendant. Thompson v. Grumman Aerospace Corp., 78 N.Y.2d 553, 578 N.Y.S.2d 106 (1991).

The amendment to the Workers' Compensation Law cited by The Met was enacted to

protect persons who would otherwise have no basis for recovery in the event they were injured on

the job. By including these persons under the Workers' Compensation Law, these persons are

ensured monetary compensation without the need to litigate. This amendment was not intended to

6

preclude or otherwise limit a worker from receiving additional or other awards they would be entitled to due to their employer's negligence. It was, as The Met stated in his Memorandum in Support, enacted so that employers could not evade the intent of the Labor Law by treating musicians and performers as independent contractors instead of employees. Further, it was enacted to "end the equity under which [workers in the performing arts] have been suffering at times when they can least afford it." (See page 6 of movant's Memorandum in Support of its Motion to Dismiss).

In fact, even after the Workers' Compensation Law was amended in 1986 to extend coverage to musicians and performing artists, many cases in New York continued to find performance artists to be independent contractors and not employees (*See Pilates, Inc. v. Current Concepts, Inc.*, 120 F.Supp.2d 286 (S.D.N.Y., 2000), where a dancer was considered an independent contractor; *see also, Matter of Di Carlo Inc.*, 234 A.D.2d 802, 651 N.Y.S.2d 248 (3rd Dept. 1996), where the court held that professional musicians who played at a bar were considered independent contractors of the bar and not employees; *see also, Jacobs v. Felix Bloch Erben Verlag fur Buhne Film und Funk KG*, 160 F.Supp.2d 722 (S.D.N.Y., 2001), where an agency in the field of hiring out actors and musicians to production companies was considered an independent musical contractor.)

Strictly construing the amendment to the Workers' Compensation Law in this case would severely prejudice the plaintiff. **Plaintiff never received any benefits or monetary awards from The Met's Workers' Compensation insurance. A portion of plaintiff's medical bills were paid, only.** Workers' Compensation has not compensated plaintiff for lost time benefits (A copy of the Workers' Compensation Notice of Action on Claim for Benefits is annexed hereto as

7

**EXHIBIT "B")**. He has not received a schedule loss of use award, nor has he been compensated for the many injuries and losses suffered as a result of this accident, to any extent whatsoever. In fact, it does not appear that Workers' Compensation intends to pay plaintiff for any of the injuries he suffered, other than the medical bills paid previously.

Plaintiff has suffered severe injuries as a result of this accident. His injuries have continued to seriously affect his daily life. For instance, plaintiff can no longer drive his vehicle long distances, or at night; he requires the use of reading glasses, for a time, he could only accept engagements where his rehearsal schedule could be adapted to give him time to rest and undergo medical examinations, and also where a specialized musical copy writer would be hired to prepare orchestra parts. Plaintiff cannot read for long periods of time, as his vision becomes blurred quickly, making precision work impossible. He was forced to forego an engagement to sing in future performances in an opera production because the role required him to sing while being in constant movement high above the stage in subdued light, which he could not do as a result of his injuries. He has difficulties moving in the dark and climbing on a set. Since the accident, plaintiff has continued to suffer pain in his thigh, as well as back and neck pains, in addition to the loss of vision in his left eye (See plaintiff's two Affidavits, together annexed hereto as **EXHIBIT "C"**).

The fact that The Met provided Workers' Compensation benefits, and the Workers' Compensation Board accepted plaintiff's claim, does not in itself classify plaintiff as a covered employee of The Met, barring him from bringing a negligence action against The Met. **In fact, because plaintiff has not received a Workers' Compensation award beyond the payment of medical bills, to classify plaintiff as an employee for the purposes of this action would serve**

only to prejudice plaintiff and preclude him from any recovery whatsoever, which he is clearly entitled to, given his injuries and the blatant negligence of defendants.

## POINT II

## AT THE TIME OF THE ACCIDENT, PLAINTIFF WAS ENGAGED BY THE MET TO PERFORM IN A LIMITED NUMBER OF PRODUCTIONS, ON A PER PERFORMANCE BASIS.

Plaintiff resides and is domiciled in France and travels to New York and the United States to engage in certain artistic productions. His first performance at The Met was in 1998. The plaintiff executed a separate and different contract each time he was engaged to perform at The Met. On April 8, 2002, plaintiff entered into a contract with The Met to perform in certain performances of the production of the Opera entitled "Falstaff" during the 2005/2006 season. This contract, annexed hereto as **EHXIBIT "D"**, is clearly entitled, and understood by both plaintiff and The Met to be, a "per performance" contract. See also **EXHIBIT "C"**, wherein plaintiff swears to the facts set forth herein and above.

The contract included information such as the role to be played by plaintiff, the date he was to appear for rehearsals, the dates of performances, and compensation. The contract indicated that The Met was to reimburse plaintiff for living expenses while he was in New York for rehearsals and performances. The Met was also to pay for plaintiff's flights to New York from France prior to the first rehearsal, and then back to France from New York after the last performance. Plaintiff indicated that he was paid at the end of each rehearsal week, and also after each on-stage performance of "Falstaff" (See **EXHIBITS "C" and "D"**).

The contract expressly indicated that no employer-employee relationship existed between plaintiff and The Met (See **EXHIBIT "D"**, page 2). Plaintiff stated that he was not restricted from accepting any other engagements during the term of the contract. Plaintiff was also told that The Met could cancel or alter the terms of the contract in case of insufficiency or any artistic reasons (See **EXHIBIT "C"**).

Plaintiff stated, in his Affidavit, that other "Falstaff" performers were also under similar contracts as he, and were also not employees of The Met. The only artists that were employees of The Met, that he was aware of, were a few, what were known as "weekly singers" and members of the choir, who were full-time employees of The Met. Plaintiff stated that a team of people, all under contract with The Met, and not employees of The Met, controlled and directed the manner, details and ultimate result of his work on the production of "Falstaff". This team consisted of a conductor and his assistant, a prompter, a coach, a director, and others. Plaintiff did not believe that any Met employees were ever present at his studio rehearsals to oversee the production and the artists. He stated that the actors/singers would rehearse in a studio, and not on the stage at The Metropolitan Opera House at Lincoln Center. Plaintiff states that The Met did not retain any authority over him to direct him in his performance, other than the hiring of the conductor (See **EXHIBIT "D"**).

<u>**POINT III**</u>

**THE EVIDENCE OF RECORD SUPPORTS A FINDING THAT PLAINTIFF WAS IN FACT AN INDEPENDENT CONTRACTOR AND NOT AN EMPLOYEE OF THE MET.**

An independent contractor is "one who, in exercising an independent employment, contracts to do certain work according to his own methods, and without being subject to the control of his employer, except as to the product or result of his work." *See Cubby, Inc. v. CompuServe, Inc.*, 776 F.Supp. 135, 142-43 (S.D.N.Y. 1991). Generally, whether a plaintiff is an independent contractor or an employee is a question of fact for the jury. *See Lumbermens Mut. Cas. Co. v. Banco Espanol de Credito, S.A.*, F. Supp.2d, 2006 WL 2987694 (S.D.N.Y. 2006).

In <u>Frankel v. Bally, Inc.</u>, 987 F.2d 86 (2nd Cir. 1993), the U.S. Court of Appeals stated that courts have developed tests to analyze whether an individual's status is that of either an independent contractor or an employee. The trend is to apply the so-called "hybrid test" which offers a non-exhaustive list of factors to be considered, placing great emphasis on the hiring

party's right to control the manner and means by which the work is accomplished, as part of a flexible analysis of the "totality of the circumstances." *Id* at 88.

In Hilton Int'l Co. v. NLRB, 690 F.2d 318 (2nd Cir. 1982), the U.S. Court of Appeals utilized the following factors to find that musicians in steady-engagement bands at hotels were not hotel employees, but rather, employees of their band leaders, who were independent contractors. In determining employee status, the Court considered: (1) whether the purported employee is engaged in a distinct occupation or business; (2) whether the work involved is usually done under an employer's direction or by an unsupervised specialist; (3) the skill involved; (4) who supplies the instrumentalities and place of performance; (5) the length of employment; (6) the method of payment (by the time or by the job) and purpose of hiring; (7) whether the work is part of the employer's regular business and/or necessary to it; and (8) the intent of the parties creating the relationship. No single factor is determinative.

Addressing the individual factors one at a time, plaintiff will clearly show that he was an independent contractor, or at the very least, offer sufficient evidence in support of a finding that he was an independent contractor, to defeat defendant's motion to dismiss.

First, the factor of whether the purported employee is engaged in a distinct occupation or business is relevant in determining the relationship between The Met and plaintiff. Because plaintiff was engaged in the distinct occupation as a highly skilled performer/singer/actor, the work he performed for The Met could likely be considered performed as an independent contractor. (See Hilton v. NLRB, supra at 118, where the court found band members to be independent contractors as they were highly skilled members of a clearly distinct occupation).

Second, the Court should consider whether the work involved is usually done under an employer's direction or by an unsupervised specialist. In the instant case, The Met did not directly control or supervise plaintiff's work. Instead, a team of specialists, including a conductor, the conductor's assistant, a prompter, a voice coach, and a director, all controlled the manner, details and ultimate results of plaintiff's work (See **EXHIBIT "C"**). Similarly, in

11

Hilton v. NLRB, 690 F.2d at 114, the Court determined that, because band leaders exercised significant control over the manner of their own and their musicians' performances, the band leaders were independent contractors. Further, no employees of The Met attended or supervised plaintiff's rehearsals (**Ex. "C"**). These facts support plaintiff's position that he was in fact, an independent contractor of The Met.

As to the third and fourth factors, plaintiff was hired by The Met to perform services as an opera singer and actor, in Italian and French. Such work requires particularly specialized skill. Courts have held that the level of skill associated with being an architect, computer programmer, graphic artist, photographer, or treasurer suggests that workers who perform these jobs are independent contractors. Keller v. Niskayuna Consol. Fire Dist. 1, 51 F.Supp.2d 223 (N.D.N.Y. 1999). In Hilton v. NLRB, supra at 118, the Court found that the musicians and band leaders who performed in Association hotels are highly skilled members of a clearly distinct occupation, and the band members provide their own instruments and their own sheet music, bolstering the finding that they were independent contractors. Further, in Frankel v. Bally, Inc., 987 F.2d 86 (2nd Cir. 1993), the U.S. State of Appeals held, based in part on the fact that the band members provided their own instruments and sheet music, as well as other supporting evidence, that the band members were independent contractors.

The same would clearly apply to a world-renowned French and Italian Opera singer, such as plaintiff, Jean-Claude Fouchecourt. He is clearly a highly skilled Opera singer and actor, which is a distinct occupation, and brings his own personal touches and effects, as well as his distinguished voice, to each performance. It is unclear who provided the sheet music and instruments, but upon the plaintiff's information and belief, these necessities were provided by the director and conductor of the production, who were also under contract with The Met. These factors seamlessly support a finding that plaintiff was an independent contractor.

Fifth, the length of plaintiff's employment with The Met supports a characterization as an independent contractor. The Court in Eisenberg v. Advance Relocation & Storage, Inc., 237

F.3d 111 (2d Cir. 2000) stated that a relatively short tenure, such as plaintiff Eisenberg (who worked for defendant, Advance, for only 28-35 days, ordinarily implies that a worker is an independent contractor. In the case at bar, plaintiff was engaged by The Met in the periods from September 19, 2005 through October 22, 2005 and from April 3, 2006 through April 8, 2006 (See **EXHIBIT "D"**). He was also required, via contract, to "be available" for four rehearsal weeks from August 29, 2005 through September 18, 2005 and from March 27, 2006 through April 2, 2006. Such brief periods of employment, consisting of 13 performances, four covers, and four weeks of rehearsal, would clearly classify plaintiff, based upon caselaw, as an independent contractor. In fact, plaintiff agreed to be available to work for only a period of less than nine (9) weeks, in total.

Furthermore, in the Aymes case, the court found that undisputed gaps in the plaintiff's employment suggests that he was not a full-time employee, but rather an independent contractor. The plaintiff in that case worked for defendant for two years, but also did occasional work for others at the same time. Similarly, in the case at bar, plaintiff contracted to be available for The Met from August 29, 2005 through October 22, 2005 and March 27, 2006 through April 8, 2006. This short duration of employment, with a five (5) month gap between performances, suggests that plaintiff was in fact an independent contractor. Additionally, plaintiff was not restricted from accepting other engagements, or performing in other productions during that time (**EXHIBIT "C"**). Further, prior to entering into the 2005/2006 contract with The Met, plaintiff was last engaged by The Met in 1998. He did no work for The Met at any time in the seven years between the two contracts. (*See* Aymes v. Bonelli, at 863).

Sixth, Courts will also look at the method of payment (by the time or by the job), as well as whether one was hired for a specific project, to determine a persons' work status. **The contract between plaintiff and The Met clearly states that plaintiff was hired specifically to perform in productions of "Falstaff" and "Manon" in the months of September and October of 2005 and April of 2006. Courts have held that "independent contractors are**

**typically hired only for particular projects."** (Aymes v. Bonelli, 980 F.2d 857 (2nd Cir. 1992)).

In Eisenberg v. Advance Relocation & Storage, Inc., 237 F.3d 111, (2nd Cir. 2000), the court stated that "[c]ompensation primarily or exclusively on the basis of time worked (rather than on the basis of projects completed) suggests that a worker is an employee. In that case, the plaintiff was considered an employee based in part on her being paid on an hourly basis. Dissimilarly, in the instant action, the contract, and plaintiff, in his Affidavit, states that plaintiff would be paid by The Met *after each performance*, and on a weekly basis during rehearsals. He was not paid on an hourly basis, and did not work regular hours, as employees usually are. He would rehearse whenever the director told him to, and was paid by The Met a sum certain, regardless of the hours worked or the quality of his work (*See* **EXHIBITS "C"** and **"D"**). The lump sum payments for each performance, and the terms of his compensation, as set forth in his contract (specifically that he would be paid on the basis of performances completed), bolster the position that plaintiff was an independent contractor. (Aymes v. Bonelli, 980 F.2d. at 863).

Seventh, whether the work is part of the employer's regular business and/or necessary to it, is a factor that will always have little weight in this analysis, so it should not be considered. (*See* Aymes v. Bonelli, at 864). The Met was in the business of putting on productions, and plaintiff was in the business of performing. Plaintiff's work was necessary to The Met's business, but that indicates nothing about whether plaintiff was an employee in that business. (*Id.* at 864). As such, this factor offers no insight as to the plaintiff's employment status in this case.

Lastly, and perhaps most importantly, the Court must consider the intent of the parties creating the relationship. The Met and plaintiff entered into a "Per Performance" contract, indicating that The Met intended to engage "Principal's services as singer on an *individual performance basis*" (emphasis added). (**EXHIBIT "D"**). Furthermore, the contract set forth that "nothing contained in this agreement shall constitute Association the employer of Principal or Principal its employee" (*Id.*). Plaintiff was hired by The Met to perform in 13 performances and

four (4) covers, and to *be available* for four weeks of rehearsals. Such a brief stint with The Met, lasting only about two months, and ceasing immediately after the final performance, clearly indicates that both parties to this contract did not intend an employee-employer relationship to ensue as a result of said contract.

Considering all of the relevant factors presented above, as the Court must, in considering plaintiff's employment status, plaintiff has provided sufficient evidence to defeat The Met's motion to dismiss. The facts set forth above and in plaintiffs affidavits (Exhibit "C") establish that Mr. Fouchecourt was, and is, an independent contractor, and not an employee of The Met at the time of the accident.

**POINT IV**

**THE INTENT OF THE WORKERS' COMPENSATION LAW IS NOT TO PROTECT NEGLIGENT PERSONS FROM CLAIMS BY SELF-EMPLOYED, STAR PERFORMERS, SUCH AS MR. FOUCHECOURT**

Movant argues at it's "POINT III", the untenable position that, in effect, there can be no independent contractors in the music industry in New York State. Reference is made in the Movant's support to legislative histories that actually belie this proposition. It is shown clear from the legislative history presented by the Movant itself that the purpose of the amendment of the Workers' Compensation Law before the Court was to codify the rights of performers who were "de-facto" employees previously improperly denied workers' compensation and forced to litigate for benefits. Plaintiff does not fall into this category.

At the Movant's Exhibit "E" p.6-7, in a writing to the Governor's Counsel by the amending bill's sponsor **actually cited by the Movant** (at Page 5 of his affirmation), movant argues that:

> "Assemblyman Robach explained that without the amendment, the aforementioned performers would be forced to litigate in order to be

15

'awarded their due benefits'",

The argument is misleading if applied to the Plaintiff in this matter.  Mr. Robach describes in the preface to the defendant's quoted statement (at the last sentence on the prior page) who are "the aforementioned performers":

> "Concerning musicians and performers, the vast majority who are not in the 'star' category . . .":

In the matter at bar, **the plaintiff is a "star" performer**.  Annexed hereto as **EXHIBIT "E"**, the Court will find the cast listing from the program of the first performance of "Falstaff" at the Met that season.  Mr. Fouchecourt is featured as the character "Bardolfo", a major role in the production.

A deeper review of the legislative history presented by the Movant is instructive.  The provision under which it seeks to deny this plaintiff his day in court was not meant to apply to the matter before this Court.  The state of the law pre-amendment is described in submissions made in support of the provision found in the bill jacket from The Associated Musicians of Greater New York, Local 804 by it's President John Glasel (At Movant's Exhibit "F", p. 70) and from the New York State AFL-CIO, jointly by it's President Edward Cleary and it's Director of Legislation and Research, Richard Winsten (At Movant's Exhibit "F", p. 66-67).  The focus of the issues appears to have been attempts by employers to cast performers as "independent contractors" when they actually were not independent contractors.   Against such improper classification, before the amendment, the AFL-CIO described the dilemma of an unemployed or injured performer, pre-amendment, at p. 66-67:

> "A musician or performer who has the resources or determination to contest his independent contractor status may succeed in showing that he is an 'employee' under the administrative definition.  This procedure is, however, burdensome and costly for unemployed or underemployed

> musicians or performers. This bill would provide that employers could not
> evade the intent of the Labor Law by treating musicians and performers as
> independent contractors when they are really employees under the
> supervision and control of employers"

Those performers who undertook the "burdensome and costly" administrative procedures, were

successful before the amendment, and such success was argued in the legislature as a reflection

of the intent of the Labor Law to be incorporated into the law by the subject amendment, as set

forth by the Musicians Union at p. 70:

> "The enaction of this law will end the all too common necessity for
> musicians and other artists to resort to lengthy and costly appeals in order
> to collect benefits **which, according to past practice, have uniformly
> been granted them when their eligibility has been contested by way of
> the argument that they are independent contractors."** (emphasis
> supplied)

As revealed by the legislative history submitted by the movant, it was not the intent of the

original law nor the legislative intent of the amendment under which this motion is made to

protect negligent persons from responsibility to a truly self employed person. Additionally, as set

forth below, self employed persons were not and still are not subject to the restrictions on causes

of action of the New York Workers' Compensation Law as argued in this motion. The motion to

dismiss Plaintiff's Complaint should be denied.

## POINT V

## PLAINTIFF DOES NOT FALL WITHIN THE DEFINITION OF "EMPLOYEE" UNDER NEW YORK STATE'S WORKERS' COMPENSATION LAW

**Movant** proposes that this action is barred by the Workers' Compensation Law and

**misquotes the provision of the law** which it proposes defines Plaintiff as an "employee" and

covered by Workers' Compensation!

17

Messrs. Rychik and Fluger quote, at Page 4 of their Memorandum of Law:

> "According to {section}2, Paragraph 4 of the New York State Workers'Compensation Law, '. . . a person otherwise engaged in the performing arts . . . **and is not stipulated to be an employee of another is covered by this chapter**.'" (emphasis supplied)

This quoted language is not accurate and does not reflect either the intent of the 1986 amendment which brought performers within the purview of the definition of "employee" or the meaning of the actual language of the statute as amended. The misquoted presentation, logically extended, stands for the untenable proposition that no person performing in New York State can be an independent contractor.

For the convenience of the Court, section 2 of the New York State Workers' Compensation law is annexed as **EXHIBIT "F"**. The provision reflecting the 1986 amendment is highlighted/underlined on the third page of **EXHIBIT "F"**. As can be seen, where the Movant quotes ". . . **and is not stipulated to be an employee of another is covered by this chapter**", the law actually states " . . . *unless, by written contract, such musician or person is stipulated to be an employee of another employer covered by this chapter.*"

The difference may be subtle. ". . . [A]nother employer covered by this chapter" would include the self-employed who are covered by the chapter and excluded from the definition of "employee" for the purposes of the Workers' Compensation Law in the second sentence of the subject Paragraph 4 where it states:

> "The term "employee" shall not include . . . a self-employed person . . . " (highlighted/underlined on page 2 of **EXHIBIT "F"**).

Mr. Fouchecourt's contract, **EXHIBIT "D"** herein, is personal by its terms, between the movant and an individual:

> *(First paragraph)*: ". . . by and between . . . {The Met}(hereinafter called 'Association') . . . and Jean-Paul Fouchecourt (hereinafter called 'Principal') . . . "
>
> *(Third paragraph from the end)*: "It is specifically agreed and understood that nothing contained in this agreement shall constitute Association the employer of Principal or Principal its employee"

These provisions surely qualify as the required written contract stipulation that the performer is an employee of himself. As self-employed persons are covered by the subject chapter of the applicable Law, specifically excluded from its provisions, Jean-Paul Fouchecourt does not fall within the definition of "Employee" and his Complaint should not be dismissed.

Further, since by its "STANDARD PRINCIPAL'S CONTRACT", The Met defines its principal performers as not an employee, in Equity, it should not now be heard to claim protection from claims of its negligence by the shield of the Workers' Compensation Law.

In the case at bar, taking into consideration the totality of the circumstances, and the factors set forth above, plaintiff has offered sufficient proof to support his claim against The Met and defeat The Met's motion to dismiss.

## CONCLUSION

A motion to dismiss should only be granted where a plaintiff can prove no facts in support of his claim that would entitle him to relief, with a court liberally construing the claims, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in favor of the plaintiff.

The evidence of record supports a finding that plaintiff was an independent contractor and

19

thus would not fall under the Workers' Compensation Law. The totality of the circumstances in this case supports plaintiff's claim that there was no employer-employee relationship between himself and The Met. He worked pursuant to a per performance contract with The Met, was hired only to perform in certain productions, received compensation after each performance, and was not directly supervised or controlled by The Met or its employees. All parties specifically intended no employer-employee relationship to exist between them, and agreed that plaintiff was hired on an individual performance basis. (See **EXHIBITS "C"** and **"D"**).

Plaintiff was not a steadily engaged performer with The Met, but as a performer, was regularly engaged by many different companies and associations on a per performance basis for the purposes of performing in certain productions. He was not restricted from any other engagement during the short duration of his contract with The Met. As such, the plaintiff was clearly an independent contractor at the time of the accident, and was not, nor was he ever, an employee of The Met.

Furthermore, the purpose of the Workers' Compensation Law is to protect those injured in the course of their employment who would otherwise have no available relief. In the case at bar, plaintiff has not received full Workers' Compensation benefits and would be severely prejudiced by dismissal of this action. At this point, only a portion of plaintiff's medical bills have been paid by Workers' Compensation, and Workers' Compensation has npt paid for plaintiff's lost time. Granting defendant's motion to dismiss would serve only to prejudice plaintiff and preclude him from any recovery whatsoever, which he is clearly entitled to, given the severity of his injuries as a result of the defendants' negligence.

Additionally, Mr. Fouchecourt, a 'star performer', is not the type of person meant to be covered under the Amendment to the Workers' Compensation Law. The amendment was enacted to protect those unemployed or underemployed persons, who would have no other viable means of recourse against negligent employers. It was clearly not meant to pretect negligent persons from responsibility to a self-employed person. Finally, Mr. Fouchecourt does not fall

within the "covered employee" category of the Workers' Compensation Law.  A reading of the Contract clearly reveals that both The Met and Mr. Fouchecourt intended that Mr. Fouchecourt shall be considered an employee of himself, and that no employer-employee relationship exists between The Met and Mr. Fouchecourt.  The Met's attempt to use New York State's Workers' Compensation Law as both a sword and a shield should not be tolerated by this Court, and Plaintiff's Complaint should not be dismissed.

WHEREFORE, affirmant respectfully requests that the within motion be denied in all respects, together with such other, further, and different relief as to this Court seems just and proper.

Dated:  New York, New York
        December 6, 2007

_____
GERARD A. CONNOLLY, JR., ESQ. (GC 0247)

## ATTORNEY CERTIFICATION PURSUANT TO 22NYCRR 130-1.1a

Pursuant to 22 NYCRR 130-1.1a, the undersigned, an attorney admitted to practice in the courts of New York State, certifies that, upon information and belief, and after reasonable inquiry, the contentions contained in the annexed document(s) are not frivolous.

Dated:  December 6, 2007

_____
GERARD A. CONNOLLY, JR., ESQ.

Our File No: Y8228;CR

EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**JUDGE CHIN**

------------------------------------------------------------------X

JEAN-PAUL FOUCHECOURT,

COMPLAINT
AND JURY DEMAND

                             Plaintiff,

Civil No.:

   -against-

**'07 CIV 3778**

METROPOLITAN OPERA ASSOCIATION, INC.,
FRANCO ZEFFIRELLI and HARTFORD FIRE
INSURANCE COMPANY,

**PLAINTIFF DEMANDS
A TRIAL BY JURY**

                           Defendants.

------------------------------------------------------------------X

RECEIVED
MAY 14 2007
U.S.D.C. S.D. N.Y.
CASHIERS

     Plaintiff, JEAN-PAUL FOUCHECOURT, by his attorneys, BUDIN, REISMAN,

KUPFERBERG & BERNSTEIN, LLP, complaining of the defendants herein, respectfully shows to

this Court and alleges:

<u>JURISDICTION</u>

    1.   That at all times hereinafter mentioned, plaintiff was not a citizen of the United

States of America.

    2.   That at all times hereinafter mentioned, plaintiff was a resident of France.

    3.   Upon information and belief, that at all of the times hereinafter mentioned,

defendant METROPOLITAN OPERA ASSOCIATION, INC. was and still is, a corporation

organized and existing under the laws of the State of New York.

    4.   Upon information and belief, that at all of the times hereinafter mentioned,

defendant, FRANCO ZEFFIRELLI, was a resident of the State of California.

    5.   Upon information and belief, that at all of the times hereinafter mentioned,

HARTFORD FIRE INSURANCE COMPANY, did business within the State of New York and

maintained offices at 300 S. State Street, Syracuse, New York, 13202.

    6.   That this Honorable Court has jurisdiction of the subject matter of this action

pursuant to 28 U.S.C. 1332(2), by reason of the fact that it is predicated upon claims where there is

diversity of citizenship between Plaintiff and Defendants and upon the fact that this is an action for

an amount in excess of SEVENTY-FIVE THOUSAND and 00/100 ($75,000.00) DOLLARS, exclusive of interest and costs.

VENUE

7.  Pursuant to 28 U.S.C. § 1391(a)(2), Venue lies in the Southern District of New York because:

> That judicial district is where a substantial part of the events or omissions giving rise to the claim occurred.

CLAIM FOR RELIEF against METROPOLITAN OPERA ASSOCIATION INC. and against FRANCO ZEFFIRELLI

8.  Upon information and belief, that at all of the times and places hereinafter mentioned, defendant, METROPOLITAN OPERA ASSOCIATION, INC., was the owner of premises known as the Metropolitan Opera House located at Lincoln Center, in the City, County and State of New York.

9.  Upon information and belief, that at all of the times and places hereinafter mentioned, defendant, METROPOLITAN OPERA ASSOCIATION, INC., operated the aforesaid premises.

10. Upon information and belief, that at all of the times and places hereinafter mentioned, defendant METROPOLITAN OPERA ASSOCIATION, INC. managed the aforesaid premises.

11. Upon information and belief, that at all of the times and places hereinafter mentioned, the aforesaid premises was under the control of the defendant METROPOLITAN OPERA ASSOCIATION, INC.

12. Upon information and belief, that at all of the times and places hereinafter mentioned, defendant METROPOLITAN OPERA ASSOCIATION, INC., its agents, servants and/or employees maintained the aforesaid premises.

13. Upon information and belief, that at all of the times and places hereinafter mentioned, it was the duty of the defendant METROPOLITAN OPERA ASSOCIATION, INC., its agents, servants and/or employees, to keep the aforesaid premises in a safe and proper manner.

14. Upon information and belief, that at all of the times and places hereinafter mentioned, defendant FRANCO ZEFFIRELLI produced a certain opera at the aforesaid premises known as "Falstaff", by Giuseppe Verdi.

15. Upon information and belief, that at all of the times and places hereinafter mentioned, defendant METROPOLITAN OPERA ASSOCIATION, INC. produced a certain opera at the aforesaid premises known as "Falstaff", by Giuseppe Verdi.

16. Upon information and belief, that at all of the times and places hereinafter mentioned, defendant FRANCO ZEFFIRELLI produced the aforesaid opera on behalf of the defendant METROPOLITAN OPERA ASSOCATION, INC.

17. Upon information and belief, that at all of the times and places hereinafter mentioned, defendant METROPOLITAN OPERA ASSOCATION, INC. produced the aforesaid opera on behalf of the defendant FRANCO ZEFFIRELLI.

18. Upon information and belief, that at all of the times and places hereinafter mentioned, defendant FRANCO ZEFFIRELLI was in charge of set design for the aforesaid opera production.

19. Upon information and belief, that at all of the times and places hereinafter mentioned, defendant METROPOLITAN OPERA ASSOCIATON, INC. was in charge of set design for the aforesaid opera production.

20. Upon information and belief, that at all of the times and places hereinafter mentioned, defendant FRANCO ZEFFIRELLI created the set design for the aforesaid opera production.

21. Upon information and belief, that at all of the times and places hereinafter mentioned, defendant METROPOLITAN OPERA ASSOCIATON, INC. created the set design for the aforesaid opera production.

22. Upon information and belief, that at all of the times and places hereinafter mentioned, defendant FRANCO ZEFFIRELLI implemented the set design for the aforesaid opera production.

23. Upon information and belief, that at all of the times and places hereinafter mentioned, defendant METROPOLITAN OPERA ASSOCIATON, INC. implemented the set design for the aforesaid opera production.

24. Upon information and belief, that at all of the times and places hereinafter mentioned, defendant FRANCO ZEFFIRELLI maintained the set for the aforesaid opera production.

25. Upon information and belief, that at all of the times and places hereinafter mentioned, defendant METROPOLITAN OPERA ASSOCIATON, INC. maintained the set for the aforesaid opera production.

26. Upon information and belief, that at all of the times and places hereinafter mentioned, defendant FRANCO ZEFFIRELLI managed the set for the aforesaid opera production.

27. Upon information and belief, that at all of the times and places hereinafter mentioned, defendant METROPOLITAN OPERA ASSOCIATON, INC. managed the set for the aforesaid opera production.

28. Upon information and belief, that at all of the times and places hereinafter mentioned, defendant FRANCO ZEFFIRELLI supervised the set for the aforesaid opera production.

29. Upon information and belief, that at all of the times and places hereinafter mentioned, defendant METROPOLITAN OPERA ASSOCIATON, INC. supervised the set for the aforesaid opera production.

30. Upon information and belief, that at all of the times and places hereinafter mentioned, it was the duty of the defendant FRANCO ZEFFIRELLI to undertake and keep the aforesaid opera production in a safe and proper manner.

31. Upon information and belief, that at all of the times and places hereinafter mentioned, it was the duty of the defendant METROPOLITAN OPERA ASSOCIATION, INC. to undertake and keep the aforesaid opera production in a safe and proper manner.

32. Upon information and belief, that at all of the times and places hereinafter mentioned, it was the duty of the defendant FRANCO ZEFFIRELLI to design, undertake and keep the set for the aforesaid opera production in a safe and proper manner.

33. Upon information and belief, that at all of the times and places hereinafter mentioned, it was the duty of the defendant METROPOLITAN OPERA ASSOCIATION, INC. to design, undertake and keep the set for the aforesaid opera production in a safe and proper manner.

34. Upon information and belief, that at all of the times and places hereinafter mentioned, plaintiff entered into a contract with the defendant FRANCO ZEFFIRELLI to perform as a Principal in the aforesaid opera production.

35. Upon information and belief, that at all of the times and places hereinafter mentioned, plaintiff entered into a contract with the defendant METROPOLITAN OPERA ASSOCIATION, INC. to perform as a Principal in the aforesaid opera production.

36. That on or about October 22, 2005, while plaintiff was performing his duties upon the stage at premises known as the Metropolitan Opera House located at Lincoln Center, in the City, County and State of New York, he was caused to fall from the upper platform portion of the set design and sustain serious and severe personal injuries as a result of the defendants' negligence.

37. The above mentioned occurrence and the results thereof were caused by the negligence, carelessness and recklessness of the defendants, their agents, servants, employees and/or licensees in the ownership, operation, management, maintenance and control of the aforesaid premises, and more particularly, the aforesaid stage set and and set design at the aforesaid premises; in causing, allowing and permitting aforesaid stage and set and set design at the place above-mentioned to be, become and remain for a period of time after notice, either actual or constructive, in a irregular, defective, dangerous, hazardous and/or unsafe condition; in that they caused, allowed

5

and permitted the implementation of a set design that was dangerous and unsafe for the persons performing on stage, including this plaintiff; in failing to provide proper and adequate protection for persons performing on the stage including this plaintiff; in that they designed, caused, allowed and/or permitted the upper platform portion of the set to be and remain in a dangerous condition and to contain only a painted curtain as the background; in failing to put a railing, wall and/or proper protection on the upper platform portion of the set to prevent a fall such as the one complained of herein; in causing, allowing and permitting a trap to exist at said location; in failing to design and maintain the aforesaid stage and set in a reasonably safe and proper condition; in causing, allowing and permitting an obstruction to plaintiff's safe passage at said location; in causing, allowing and permitting the existence of a condition which constituted a trap, nuisance, menace and danger to persons performing on the stage including this plaintiff; in failing to have taken necessary steps and measures to have prevented the above mentioned location from being used while in said dangerous condition; in failing to give plaintiff adequate and timely signal, notice or warning of said condition; in negligently and carelessly causing and permitting the aforesaid stage and/or set to be and remain in said condition for an unreasonable length of time, resulting in a hazard to the plaintiff and others; in failing to take suitable and proper precautions for the safety of persons on and using said stage and/or set; and in being otherwise negligent and careless; in producing said opera without proper regard for the unsafe condition of the set.

38. That the defendants, their agents, servants and/or employees knew or in the exercise of reasonable care could and should have known of the irregular, defective, dangerous, hazardous and unsafe condition of the aforesaid stage and/or set.

39. That as a result of the negligence of the defendants, their agents, servants and/or employees, plaintiff sustained injuries to various parts of his head, body, limbs and nervous system and, upon information and belief, some of his said injuries are of a permanent and/or protracted nature; that by reason thereof, he was confined to hospital, bed and home and prevented from attending to his usual business and/or occupation, and sustained a loss of earnings thereby; and he

was required and will be required to obtain medical aid and attention in an effort to cure and alleviate his said injuries, and has incurred obligations therefor.

40. That as a result of the foregoing, plaintiff has been damaged in a sum exceeding the jurisdictional requirements of this Court.

### CLAIMS FOR RELIEF against HARTFORD FIRE INSURANCE COMPANY and FURTHER CLAIMS FOR RELIEF against METROPOLITAN OPERA ASSOCIATION INC.

41. Plaintiff repeats and reiterates the allegations set forth in paragraphs 1 through 40 as if more fully set forth herein.

42. Upon information and belief, that at some time before October 22, 2005, defendant, HARTFORD FIRE INSURANCE COMPANY, issued and thereafter maintained a policy of insurance to defendant, METROPOLITAN OPERA ASSOCIATION INC., providing insurance against claims made by employees of defendant, METROPOLITAN OPERA ASSOCIATION INC., arising out of workplace injuries.

43. Upon information and belief, that on or about October 22, 2005, plaintiff, JEAN-PAUL FOUCHECOURT, was an outside contractor of the defendant, METROPOLITAN OPERA ASSOCIATION INC., pursuant to a written contract.

44. Upon information and belief, that at all of the times and places hereinafter mentioned, by its terms, the contract by which the defendant, METROPOLITAN OPERA ASSOCIATION INC., retained the services of plaintiff, JEAN-PAUL FOUCHECOURT, for the aforementioned production of "Falstaff" set forth that the METROPOLITAN OPERA ASSOCIATION INC. was not the employer of the plaintiff, nor was the plaintiff an employee of the METROPOLITAN OPERA ASSOCIATION INC. at all relevant times including the time that the plaintiff was injured.

45. Upon information and belief, that at the time that the plaintiff was injured, the plaintiff was not an employee of the defendants.

7

46. Upon information and belief, that at some time after October 22, 2005, the defendant, METROPOLITAN OPERA ASSOCIATION INC., filed a Worker's Compensation claim on behalf of plaintiff, JEAN-PAUL FOUCHECOURT.

47. Upon information and belief, that some time after October 22, 2005, the defendant HARTFORD FIRE INSURANCE COMPANY filed a Worker's Compensation claim on behalf of plaintiff, JEAN-PAUL FOUCHECOURT.

48. Upon information and belief, that at or about the time said Worker's Compensation claim was filed, the plaintiff was advised by defendant, METROPOLITAN OPERA ASSOCIATION INC., that his status as an "employee" foreclosed any right of action against defendant, METROPOLITAN OPERA ASSOCIATION INC., upon the claims herein asserted.

49. Upon information and belief, that at or about the time said Worker's Compensation claim was filed, the plaintiff was advised by defendant, HARTFORD FIRE INSURANCE COMPANY, that his status as an "employee" foreclosed any right of action against defendant, METROPOLITAN OPERA ASSOCIATION INC., upon the claims herein asserted.

50. Upon information and belief, that at the aforementioned time and place, the plaintiff was not an employee of METROPOLITAN OPERA ASSOCIATION INC., and not subject to Worker's Compensation laws and rules.

51. Upon information and belief, that at the aforementioned time and place, the plaintiff was not a Workers' Compensation insured of HARTFORD FIRE INSURANCE COMPANY and not insured under its policy of Workers' Compensation insurance.

52. That advice given to the plaintiff by defendant, METROPOLITAN OPERA ASSOCIATION INC., and defendant, HARTFORD FIRE INSURANCE COMPANY, operated as a fraud intended to interfere with the plaintiff's legal rights as concerns the aforementioned incident.

53. That the filing of a Worker's Compensation claim on behalf of plaintiff, JEAN-PAUL FOUCHECOURT, was a fraud upon the plaintiff, JEAN-PAUL FOUCHECOURT, which deprived him of rights of action against METROPOLITAN OPERA ASSOCIATION INC.

54. That defendant, METROPOLITAN OPERA ASSOCIATION INC., and defendant, HARTFORD FIRE INSURANCE COMPANY, conspired to deprive the plaintiff of his rights of action against METROPOLITAN OPERA ASSOCIATION INC. with respect to the injuries sustained in the aforementioned incident.

55. That defendant, METROPOLITAN OPERA ASSOCIATION INC., and defendant, HARTFORD FIRE INSURANCE COMPANY, as a result of the foregoing, are liable in damages to the plaintiff for fraud and civil conspiracy in a sum exceeding the jurisdictional requirements of this Court.

WHEREFORE, plaintiff demands judgment against the defendants in a sum exceeding the jurisdictional limit of this Court; together with interest, and the costs and disbursements of this action.

THE PLAINTIFF DEMANDS A TRIAL BY JURY ON THE CAUSES OF ACTION HEREIN.

Dated: New York, New York
       February 22, 2007

Yours, etc.

BUDIN, REISMAN, KUPFERBERG & BERNSTEIN, LLP

BY: GERARD A. CONNOLLY, ESQ.
Attorney Bar Code No. GC0247
Admitted on May 21, 1981
Attorneys for Plaintiff
112 Madison Avenue
New York New York 10016-7416
Our File No. Y8228(db)
(212) 696-5500

9

EXHIBIT B

THE HARTFORD

# NOTICE TO CHAIR OF CARRIER'S ACTION ON CLAIM FOR BENEFITS

CHECK TYPE OF CASE: [X] WORKERS' COMPENSATION   [ ] VOLUNTEER FIREFIGHTER   [ ] VOLUNTEER AMBULANCE WORKER

## ANSWER ALL QUESTIONS FULLY – TYPEWRITER OR COMPUTER PREPARATION IS REQUIRED

| ALL COMMUNICATIONS SHOULD REFER TO THESE NUMBERS | | 3. Carrier Code | 4. Date of Injury | 5. Social Security Number |
|---|---|---|---|---|
| 1. WCB Case Number | 2. Carrier Case Number | W105001 | 10-22-2005 | 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 |
| | Y L A C  OB271 | | | Address to which notices should be sent |

| 6. Injured Person | Name<br>FOUCHECOURT, JEAN PAUL | ASKONAS HOLT LIMITED--J THOMAS<br>27 CHANCERY LANE<br>FRANCE |
|---|---|---|
| 7. Employer* | METROPOLITAN OPERA ASSOCI | LINCOLN CENTER PLAZA<br>ATTN: ANN HACKETT<br>NEW YORK          NY 10023- |
| 8. Carrier | THE HARTFORD | P.O. BOX 4771<br>SYRACUSE          NY 13221-4771 |

*In volunteer firefighters' and volunteer ambulance workers' cases, enter the liable political subdivision (or unaffiliated ambulance service as defined in VAWBL) as the EMPLOYER.

9. Description (Diagnosis) of injury  LEFT EYE INJURY/CONTUSION FELL OFF PLATFORM

10. Place where injury occurred (city/county/state) NEW YORK          NY

11. Date disability began..... 10-23-2005   12. Date employer or carrier first had knowledge of injury, whichever is earlier... 10-31-2005

13. Date of receipt by carrier of employer's report of injury (C-2, VF-2 or VAW-2) (If none, so state)................................ 10-31-2005

14. Date returned to work (if applicable)........................................................

15. A. [ ] CLAIM IS NOT DISPUTED. PAYMENT HAS BEGUN.    | Complete items 1 and 2 below if either 15-A or 15-B is checked. |

B. [ ] TEMPORARY PAYMENT HAS BEGUN WITHOUT PREJUDICE AND WITHOUT ADMITTING LIABILITY (Sec. 21-a WCL)   Date first payment mailed _____
  1. Payment has begun from _____ at a weekly rate of $ _____
     [ ] Check here if weekly rate shown is a temporary rate subject to adjustment upon receipt of payroll information and complete section 2 below.
  If the rate is less than the maximum in effect on the date of the injury (WCL 15, subd. 6(a)), the basis for the computation MUST be entered in item 2 and supporting documents (payroll or other) MUST be attached.
  2. Basis For Computation -- Workers' Compensation Cases Only
     Average Daily Wage $ _____ x _____ = $ _____ -:- 52 = Average Weekly Wage
     $ _____ x 2/3 = Weekly Comp. Rate (Subject to Maximum) If temporary rate indicate basis _____
     Check here if payment made without prejudice, as provided in Sec. 50 VFBL/VAWBL, pending determination of political subdivision/vol. ambulance service liable for benefits [ ]

**Death Cases:** attach list of payees, showing name and address, relationship to deceased, date of birth, percentage of award and rate per week for each payee, if known. Also include name and address of undertaker, amount of funeral bill, amount of funeral bill paid and by whom (name and address).

16. [X]    CLAIM IS NOT DISPUTED. PAYMENT HAS NOT BEGUN FOR FOLLOWING REASON(S):
a. [X] No lost time beyond 7 days. (In volunteer firefighters' and ambulance workers' cases, 7 day waiting period does not apply.)
b. [ ] Lost time exceeds 7 days, no medical evidence indicating disability beyond 7 days. (When such evidence is available, carrier must commence payment.)
c. [X] Possible schedule loss or disfigurement, but no loss of time from work at regular wages beyond 7 days.
d. [ ] Lost time exceeds 7 days, but full wages being paid by employer during disability.
       [ ] Employer requests reimbursement in the amount of $ _____ for the period _____ to _____
e. [ ] Death case awaiting information as to dependents, if any, or dependency proofs – accidental death not controverted.
f. [ ] Other _____
The insurance company will notify the Chair, Workers' Compensation Board, and the claimant and his/her representative, if any, if benefits are stopped or modified, or of any other change in the above information.

Prepared by MARK DIEFFENBACH          Dated April 10, 2006

Official Title  CLAIM REPRESENTATIVE          Telephone No. & Extension 877-469-9222

C-669 (8-03)   Prescribed by Chair Workers' Compensation Board State of New York
NYCCAC          SEE IMPORTANT INFORMATION TO CLAIMANT AND CARRIER ON REVERSE.

EXHIBIT C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X

JEAN-PAUL FOUCHECOURT,

                                        Plaintiff,

                                                              **AFFIDAVIT**

        -against-                                    Civ No.: 07 CIV 3778
                                                     (DC)
METROPOLITAN OPERA ASSOCIATION, INC.,
and FRANCO ZEFFIRELLI,

                                        Defendants.
-----------------------------------------------------------------------X

COUNTRY OF FRANCE        )
                         )ss:
PROVINCE OF              )

        I, JEAN-PAUL FOUCHECOURT being duly sworn, deposes and says:

1.      I am the plaintiff in the above-mentioned action. I presently, and at the time of
        the accident, reside at Place de l'Eglise 71240 Beaumont-sur-Grosne, France. I
        have never, nor had I any intentions to, move to the United States for employment
        purposes.

2.      On or about October 22, 2005, while I was performing a role in the production of
        "Falstaff" at The Metropolitan Opera House (The Met), I was caused to fall from
        the upper platform portion of the set design and sustain serious and severe
        personal injuries as a result of the defendants' negligence, including the loss of
        vision of my left eye.

3.      My role in the production of "Falstaff" at The Metropolitan Opera House (The
        Met) required me, at the end of the first scene of the first act, to reach a platform
        representing a balcony. On the back of the platform was a curtain. Nothing had
        been placed beyond the curtain to protect anyone who would have come close to
        the edge of the platform.



4.  On April 8, 2002, I entered into a contract with The Met to perform in certain productions of the Opera "Falstaff" during the 2005/2006 season. This contract was clearly labeled and understood by me to be a "per performance" contract.

5.  The document attached to these papers is a true and complete copy of the contract I signed on April 8, 2002.

6.  The contract specified the role I would play in the production, the date rehearsals would begin in New York, the date of the first performance, and my compensation.

7.  The contract provided that The Met was to reimburse me for living expenses in New York during the period of the contract. Reimbursement was to be paid at the end of each week during the period I was performing. I was also given round trip airfare to travel from my home in Paris, France, to New York, New York.

8.  The contract expressly indicated that The Met was not my employer and I was not an employee of The Met.

9.  The contract allowed me, upon permission, to use costumes which were the property of The Met for performances not put on by The Met.

10. I was not restricted from any other engagement during the duration of my contract with The Met.

11. I believe that most of the other performers at The Met were under similar contracts as I was, other than a few "weekly singers" who are full-time employees of The Met. There are also members of the choir who are full-time employees of The Met.



12. During the period covered under my contract with The Met, I was paid on a weekly basis during rehearsals and then after each performance.

13. I was advised that The Met could cancel my contract in case of insufficiency or any artistic reasons.

14. A team of many people, all under separate contracts with The Met controlled and directed the manner, details and ultimate result of my work on the production of Falstaff. This team consisted of a conductor and his assistant, a prompter, a coach and a director, and others.

15. I do not believe there were any employees of The Met present at my rehearsals to oversee the general safety of the production. We rehearsed in a studio, which is at a different location from the actual production of Falstaff and had orchestra and a final dress rehearsals on the stage of The Metropolitan Opera House. Because we were on the opening time of the house, these rehearsals were few.

16. The Met did not retain any authority to direct me in my performance. During the performances, each performer is responsible for their own acting and singing. The only control The Met retained over our performances was the hiring of a conductor, who is also a performer.

JEAN-PAUL FOUCHECOURT

Sworn to before me this
ΛΛ | 13| 2007  day of November, 2007

Beaumont ᵈ1 Gⷢⷣⷦⷱⷉⷬe , le 13/11/2007
Notary Public
in pour la legalisation de la signature
du Mᵉ FOUCHECOURT Jean-Paul
opposé ci-dessus
Pour le Maire
La Secrétaire

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

JEAN-PAUL FOUCHECOURT,

      Plaintif,

      -against-

METROPOLITAN OPERA ASSOCIATION, INC.,
and FRANCO ZEFFIRELLI,
                      Defendants.
-----------------------------------------------------------------X

**AFFIDAVIT**

Civ No.: 07 CIV 3778 (DC)

COUNTRY OF FRANCE    )
                        ) ss:
PROVINCE OF             )

      I, JEAN-PAUL FOUCHECOURT being duly sworn, deposes and says:

1.      I am the plaintiff in the above-mentioned action. I presently, and at the time of the accident, reside at Place de l'Eglise 71240 Beaumont-sur-Grosne, France. I have never, nor had I any intentions to, move to the United States for employment purposes.

2.      On or about October 22, 2005, while I was performing the role of Bardolfo in the production of "Falstaff" at The Metropolitan Opera House (The Met), I was caused to fall from the upper platform portion of the set design and sustain serious and severe personal injuries as a result of the defendants' negligence, including the loss of vision of my left eye.

3.      I have never received any benefits or monetary awards from The Met Workers' Compensation insurance, other than the payment of a portion of my hospital medical bills.




4.  Workers' Compensation refused to pay me for lost time benefits because I performed in a production of Manon after the accident, pursuant to my contract with The Met. I have not received any schedule loss of use award, nor have I been compensated for the many injuries and losses I suffered as a result of my accident from the Workers' Compensation.

5.  I can no longer drive my car long distances, especially at night. Since I have done a surgery to correct my short sighted vision to avoid wearing glasses, I have lost the benefit of this surgery. I now have to use reading glasses, and I cannot read for long periods of time as my vision blurs quickly and my right eye gets tired quickly. As I have lost the depth perception, I easily confuse letters, numbers and the figures on my scores. I do need much more time to study and read new music pieces. I cannot now accept concerts in a row as in the past when I was able to read my scores during concerts. I have now to memorize every thing because I cannot trust my vision any more.

6.  I was forced to forego an engagement to sing an opera production which required me to sing while being in constant movement high above the stage in the dark light, which I cannot do because of my accident and injuries. I cannot move on stage in the dark, make acrobatics on a set as in the past and I need assistance back stage in the dark. Since the accident, I have continued to suffer pain in my thigh, as well as back and neck pains, in addition to the loss of vision in my left eye, and I more fragile psychologically especially back stage and on stage.

Sworn to before me this
day of December, 2007

JEAN-PAUL FOUCHECOURT

12 - 05 - 2007
_____
Notary Public

Vu pour la légalisation
de la signature de
Mr FOUCHECOURT Jean-Paul
apposé ci-contre
Beaumont StG - le 5-12.2007

EXHIBIT D

METROPOLITAN OPERA ASSOCIATION, INC.          APPROVED AMERICAN GUILD OF MUSICAL ARTISTS, INC.
Lincoln Center, New York, NY 10023          1727 Broadway, New York, New York 10019-5214

Case 1:07-cv-03278-DC     Document 14     Filed 12/07/2007     Page 41 of 57

## STANDARD PRINCIPAL'S CONTRACT (PER PERFORMANCE)
### SEASON 2005/2006

AGREEMENT dated April 4, 2002 made in the City, County and State of New York by and between METROPOLITAN OPERA ASSOCIATION, INC. (hereinafter called "Association"), having its Principal place of business at Metropolitan Opera House, Lincoln Center, New York, New York 10023 and **JEAN-PAUL FOUCHÉCOURT** (hereinafter called "Principal"), c/o Mr. Joel Thomas, Askonas Holt, Ltd., 27 Chancery Lane, London WC2A 1PF, UK.

WITNESSETH: In consideration of the mutual agreements herein contained, the parties agree as follows:

Association hereby engages Principal's services as singer on an individual performance basis and Principal agrees to render such services as follows:

**REHEARSAL WEEKS:**
Principal agrees to be available for four (4) rehearsal weeks:
>        from 10:00 AM August 29, 2005 through September 18, 2005
>        from 10:00 AM March 27, 2006 through April 2, 2006

and Principal shall receive therefore the applicable amount as stipulated in article VA of SECTION TWO of the collective bargaining agreement between AGMA and Association towards rehearsal expenses.

**PERIOD OF ENGAGEMENT:**
In the following periods:
>        from September 19, 2005 through October 22, 2005
>        from April 3, 2006 through April 8, 2006,

Association agrees to engage Principal for and Principal agrees to accept a minimum of thirteen (13) performances:
>        seven (7) of Bardolfo in FALSTAFF (in Italian)
>        six (6) of Guillot de Morfontaine in MANON (in French)

and four (4) covers:
>        two (2) of Bardolfo in FALSTAFF (in Italian)
>        two (2) of Guillot de Morfontaine in MANON (in French).

**COMPENSATION:**
Association agrees to pay and Principal agrees to accept the sum of SIX THOUSAND SEVEN HUNDRED FIFTY DOLLARS ($6,750) for each performance performed hereunder which performance shall include requisite rehearsals therefor. Any additional performances as agreed upon shall be compensated at the same fee.

Association further agrees to pay to Principal the sum of TWO THOUSAND TWO HUNDRED FIFTY DOLLARS ($2,250) for each covered performance. Should Principal be called upon to sing, Association agrees to pay Principal the additional sum of FOUR THOUSAND FIVE HUNDRED DOLLARS ($4,500) for each such sung performance.

**TRAVEL:**
Association will provide Principal with one (1) round trip economy class airfare, Paris, France/New York, in each of the aforementioned periods (for a total of two [2] airfares) if Principal is present there at the commencement of each period of this contract. Travel will be arranged at the minimum applicable airfare to be prorated with any other engagements en route. All travel arrangements will be made by Principal unless arranged otherwise with Association. If Association arranges travel and Principal does not accept such travel arrangements, Principal shall be responsible for all additional costs, if any.

Association agrees to reimburse Principal towards living expenses in New York up to the amount of TWELVE THOUSAND SEVEN HUNDRED FIFTY DOLLARS ($12,750) during the period(s) Principal is under contract to Association, to wit August 29, 2005 through October 22, 2005 and March 27, 2006 through April 8, 2006. Reimbursement for such living expenses will be made by Association to Principal at the end of each week during the period Principal is performing/covering for Association. In connection with such reimbursement, Principal shall furnish Association such records of expenses as may be reasonably required by Association to substantiate such expenses. In order to fulfill the rehearsal and service requirements under this contract, Principal agrees to reside in New York for a minimum average of four (4) days for each service contracted for hereunder. In the event that Principal shall fail to perform any such contracted service, then the aforesaid allowance for living expenses shall be reduced by SEVEN HUNDRED FIFTY DOLLARS ($750) for each service in which Principal shall fail to appear. Such reduction shall be in addition to any other rights and remedies Association may have under this contract.

**PRINCIPAL'S WARRANTY AND AUTHORIZATION FOR DEDUCTIONS:**
Principal hereby warrants that he/she is a member of AGMA in good standing and will remain so for the duration of this contract. Principal hereby authorizes and directs Association to deduct from his/her wages/pay any dues payable by him/her

o AGMA as AGMA may instruct Association. This authorization and direction is irrevocable for a period of one year from the date hereof or for the period of the current collective bargaining agreement in effect between AGMA and Association, whichever is sooner. Thereafter, this authorization and direction shall be automatically renewed and irrevocable for each successive one-year period or until termination of the then current collective bargaining agreement, whichever is sooner, unless revoked by Principal by sending written notice that he/she wishes to revoke all or part of it to AGMA and Association by registered mail. To be effective, such notice of revocation must be sent not more than thirty (30) days and not less than fifteen (15) days prior to the expiration of the collective bargaining agreement or the then current one-year period, whichever is sooner. Any such revocation shall become effective the first day of the calendar month following its receipt by Association.

**OTHER TERMS:**

Principal shall not disclose and will instruct his/her management not to disclose to the press or otherwise any information pertaining to this engagement until such time as Association shall agree to issue a public announcement of such engagement.

This agreement is subject to and includes all the terms and conditions contained in the collective bargaining agreement between AGMA and Association.

The indisposition of Principal shall be immediately reported to the Artistic Administration by written notice. Association may require Principal to produce a doctor's certificate within twenty-four (24) hours after notification of illness. Association may require Principal to submit to examination by a doctor designated and paid by Association.

Piano scores and singing parts that are the property of Association must be kept in good condition and returned when not required and, in any event, before the end of the season. Each Principal borrowing any piano scores or singing parts from Association may be required to furnish a deposit of fifty dollars ($50) which will be returned when such material has been restored in good condition to Association's library.

If Association shall in its discretion agree to permit Principal to use costumes which are the property of Association for performances other than those given by Association, it shall do so without compensation therefor from Principal, provided however that Principal shall be required to return any such costume cleaned and in the same condition, reasonable wear excepted.

Association shall be required to assume the expense of one (1) round trip railroad or airfare at Association's election, for each Principal engaged for the road tour or other trips away from the City of New York, provided that if Principal is engaged for non-consecutive weeks or per performance, Association will pay Principal's fare from the place of Principal's last required performance for Association to such place as Principal may elect and Principal's return fare from such point as Principal may elect to the place of Principal's next required performance provided, however, that the total of any such fares shall not exceed the fare from the place of Principal's last required performance to the City of New York and return to the place of Principal's next required performance.

It is specifically agreed and understood that nothing contained in this agreement shall constitute Association the employer of Principal or Principal its employee.

This agreement shall be governed by and construed in accordance with the laws of the State of New York and shall not be modified or discharged except by a writing executed by Association and Principal and only so long as the terms of the modification are not less favorable to Principal than as provided in the collective bargaining agreement between Association and AGMA.

This agreement shall not be binding upon Association in any respect, and Association reserves the right to withdraw its offer, unless and until it is signed below by Principal and returned back to Association which must be no later than June 4, 2002. If Association does not receive it by said date, the offer shall be null and void unless reinstated by Association in writing.

IN WITNESS WHEREOF, this contract has been executed by the parties as of the date first above written.

METROPOLITAN OPERA ASSOCIATION, INC.

Phone Number:
Social Security Number:

04/08/2002

By: _____

Signature of Principal              General Manager

EXHIBIT E

**Friday Evening, September 23, 2005, 8:00-11:05**

FIRST TIME THIS SEASON

The 168th Metropolitan Opera performance of

GIUSEPPE VERDI

# Falstaff

|  |  |
|---:|---|
| *Conductor:* | James Levine |
| *Production:* | Franco Zeffirelli |
| *Set and Costume Designer:* | Franco Zeffirelli |
| *Associate Costume Designer:* | Ann Roth |
| *Lighting Designer:* | Wayne Chouinard |
| *Stage Director:* | David Kneuss |

*Characters in order of vocal appearance:*

|  |  |
|---:|---|
| DR. CAIUS | Peter Bronder (Debut) |
| SIR JOHN FALSTAFF | Bryn Terfel |
| BARDOLFO | Jean-Paul Fouchécourt |
| PISTOLA | Mikhail Petrenko |
| MRS. MEG PAGE | Maria Zifchak |
| MRS. ALICE FORD | Patricia Racette |
| MRS. QUICKLY | Stephanie Blythe |
| NANNETTA | Heidi Grant Murphy |
| FENTON | Matthew Polenzani |
| FORD | Roberto Frontali |
| MISTRESS OF THE INN | Charlotte Philley |
| THE INNKEEPER | Roger Andrews |

EXHIBIT F

McKinney's Workers' Compensation Law § 2

McKinney's Consolidated Laws of New York Annotated Currentness
  Workers' Compensation Law (Refs & Annos)
    Chapter 67. Of the Consolidated Laws
      Article 1. Short Title; Definitions; Application (Refs & Annos)
      ➡ § 2. Definitions

As used in this chapter, 1. "Hazardous employment" means a work or occupation described in section three of this chapter.

2. "Department" means the department of labor of the state of New York;

"Chairman" means the chairman of the workmen's compensation board of the state of New York;

"Commissioner" means the industrial commissioner of the state of New York;

"Board" means the workmen's compensation board of the state of New York;

"Commissioners" means the commissioners of the state insurance fund of the department of labor of the state of New York.

3. "Employer," except when otherwise expressly stated, means a person, partnership, association, corporation, and the legal representatives of a deceased employer, or the receiver or trustee of a person, partnership, association or corporation, having one or more persons in employment, including the state, a municipal corporation, fire district or other political subdivision of the state, and every authority or commission heretofore or hereafter continued or created by the public authorities law. For the purposes of this chapter only "employer" shall also mean a person, partnership, association, corporation, and the legal representatives of a deceased employer, or the receiver or trustee of a person, partnership, association or corporation who delivers or causes to be delivered newspapers or periodicals for delivering or selling and delivering by a newspaper carrier under the age of eighteen years as defined in section thirty-two hundred twenty-eight of the education law. For the purpose of this chapter only, "employer" shall also mean a person, partnership, association, or corporation who leases or otherwise contracts with an operator or lessee for the purpose of driving, operating or leasing a taxicab as so defined in section one hundred forty-eight-a of the vehicle and traffic law, except where such person is an owner-operator of such taxicab who personally regularly operates such vehicle an average of forty or more hours per week and leases such taxicab for some portion of the remaining time. For the purposes of this section only, such an owner-operator shall be deemed to be an employer if he controls, directs, supervises, or has the power to hire or terminate such other person who leases the vehicle.

Notwithstanding any other provision of this chapter and for purposes of this chapter only, "employer" shall mean, with respect to a jockey, apprentice jockey or exercise person licensed under article two or four of the racing, parimutuel wagering and breeding law performing services for an owner or trainer in connection with the training or racing of a horse at a facility of a racing association or corporation subject to article two or four of the racing, parimutuel wagering and breeding law and subject to the jurisdiction of the New York state racing and wagering board, The New York Jockey Injury Compensation Fund, Inc. and all owners and trainers who are licensed or required to be licensed under article two or four of the racing, parimutuel wagering and breeding law at the time of any occurrence for which benefits are payable pursuant to this chapter in respect to the injury or death of such jockey, apprentice jockey or exercise person.

Notwithstanding any other provision of this chapter, and for purposes of this chapter only, the employer of a black car operator, as defined in article six-F of the executive law, [FN1] shall, on and after the fund liability date, as defined in such article, be the New York black car operators' injury compensation fund, inc. created pursuant to such article.

4. "Employee" means a person engaged in one of the occupations enumerated in section three or who is in the service of an employer whose principal business is that of carrying on or conducting a hazardous employment upon the premises or at the plant, or in the course of his employment away from the plant of his employer; "employee" shall also mean for the purposes of this chapter civil defense volunteers who are personnel of volunteer agencies sponsored or authorized by a local office under regulations of the civil defense commission, to the extent of the provisions of groups seventeen and nineteen; "employee" shall at the election of a municipal corporation made pursuant to local law duly enacted also mean a member of an auxiliary police organization authorized by local law; and for the purposes of this chapter only a newspaper carrier under the age of eighteen years as defined in section thirty-two hundred twenty-eight of the education law, and shall not include domestic servants except as provided in section three of this chapter, and except where the employer has elected to bring such employees under the law by securing compensation in accordance with the terms of section fifty of this chapter. The term "employee" shall not include persons who are members of a supervised amateur athletic activity operated on a non-profit basis, provided that said members are not also otherwise engaged or employed by any person, firm or corporation participating in said athletic activity, nor shall it include the spouse or minor child of an employer who is a farmer unless the services of such spouse or minor child shall be engaged by said employer under an express contract of hire nor shall it include an executive officer of a corporation who at all times during the period involved owns all of the issued and outstanding stock of the corporation and holds all of the offices pursuant to paragraph (e) of section seven hundred fifteen of the business corporation law or two executive officers of a corporation who at all times during the period involved between them own all of the issued and outstanding stock of such corporation and hold all such offices except as provided in subdivision six of section fifty-four of this chapter provided, however, that where there are two executive officers of a corporation each officer must own at least one share of stock, nor shall it include a self-employed person or a partner of a partnership as defined in section ten of the partnership law who is not covered under a compensation insurance contract or a certificate of self-insurance as provided in subdivision eight of section fifty-four of this chapter, nor shall it include farm laborers except as provided in group fourteen-b of section three of this chapter. If a farm labor contractor recruits or supplies farm laborers for work on a farm, such farm laborers shall for the purposes of this chapter be deemed to be employees of the owner or lessee of such farm. The term "employee" shall not include baby sitters as defined in subdivision three of section one hundred thirty-one and subdivision three of section one hundred thirty-two of the labor law or minors fourteen years of age or over engaged in casual employment consisting of yard work and household chores in and about a one family owner-occupied residence or the premises of a non-profit, non-commercial organization, not involving the use of power-driven machinery. The term "employee" shall not include persons engaged by the owner in casual employment consisting of yard work, household chores and making repairs to or painting in and about a one-family owner-occupied residence. The term "employee" shall not include the services of a licensed real estate broker or sales associate if it be proven that (a) substantially all of the remuneration (whether or not paid in cash) for the services performed by such broker or sales associate is directly related to sales or other output (including the performance of services) rather than to the number of hours worked; (b) the services performed by the broker or sales associate are performed pursuant to a written contract executed between such broker or sales associate and the person for whom the services are performed within the past twelve to fifteen months; and (c) the written contract provided for in paragraph (b) herein was not executed under duress and contains the following provisions:

(i) that the broker or sales associate is engaged as an independent contractor associated with the person for whom services are performed pursuant to article twelve-A of the real property law and shall be treated as such for all purposes, including but not limited to federal and state taxation, withholding, unemployment insurance and workers' compensation;

(ii) that the broker or sales associate (A) shall be paid a commission on his or her gross sales, if any, without deduction for taxes, which commission shall be directly related to sales or other output; (B) shall not receive any remuneration related to the number of hours worked; and (C) shall not be treated as an employee with respect to such services for federal and state tax purposes;

(iii) that the broker or sales associate shall be permitted to work any hours he or she chooses;

(iv) that the broker or sales associate shall be permitted to work out of his or her own home or the office of the person for whom services are performed;

(v) that the broker or sales associate shall be free to engage in outside employment;

(vi) that the person for whom the services are performed may provide office facilities and supplies for the use of the broker or sales associate, but the broker or sales associate shall otherwise bear his or her own expenses, including but not limited to automobile, travel, and entertainment expenses;

(vii) that the person for whom the services are performed and the broker or sales associate shall comply with the requirements of article twelve-A of the real property law and the regulations pertaining thereto, but such compliance shall not affect the broker or sales associate's status as an independent contractor nor should it be construed as an indication that the broker or sales associate is an employee of the person for whom the services are performed for any purpose whatsoever;

(viii) that the contract and the association created thereby may be terminated by either party thereto at any time upon notice given to the other.

"Employee" shall also mean, for purposes of this chapter, an infant rendering services for the public good as prescribed in sections seven hundred fifty-eight-a and 353.6 of the family court act.

For the purpose of this chapter only, "employee" shall also mean a driver, operator or lessee who contracts with an owner, operator or lessor for the purpose of operating a taxicab as so defined in section one hundred forty-eight-a of the vehicle and traffic law, except where such person leases the taxicab from a person who personally, regularly operates such vehicle an average of forty or more hours per week. For the purposes of this section only, such person shall be deemed to be an employee of the owner-operator if the owner-operator controls, directs, supervises, or has the power to hire or terminate such person.

"Employee" shall also mean, for purposes of this chapter, a professional musician or a person otherwise engaged in the performing arts who performs services as such for a television or radio station or network, a film production, a theatre, hotel, restaurant, night club or similar establishment unless, by written contract, such musician or person is stipulated to be an employee of another employer covered by this chapter. "Engaged in the performing arts" shall mean performing service in connection with the production of or performance in any artistic endeavor which requires artistic or technical skill or expertise.

Notwithstanding any other provision of this chapter, and for purposes of this chapter only, a jockey, apprentice jockey or exercise person licensed under article two or four of the racing, parimutuel wagering and breeding law performing services for an owner or trainer in connection with the training or racing of a horse at a facility of a racing association or corporation subject to article two or four of the racing, parimutuel wagering and breeding law and subject to the jurisdiction of the New York state racing and wagering board shall be regarded as the "employee" not solely of such owner or trainer, but shall instead be conclusively presumed to be the "employee" of The New York Jockey Injury Compensation Fund, Inc. and also of all owners and trainers who are licensed or required to be licensed under article two or four of the racing, parimutuel wagering and breeding law at the time of any occurrence for which benefits are payable pursuant to this chapter in respect of the injury or death of such jockey, apprentice jockey or exercise person.

"Employee" shall also mean, for purposes of this chapter, a professional model, who:

(a) performs modeling services for; or

(b) consents in writing to the transfer of his or her exclusive legal right to the use of his or her name, portrait, picture or image, for advertising purposes or for the purposes of trade, directly to

a retail store, a manufacturer, an advertising agency, a photographer, a publishing company or any other such person or entity, which dictates such professional model's assignments, hours of work or

performance locations and which compensates such professional model in return for a waiver of such professional model's privacy rights enumerated above, unless such services are performed pursuant to a written contract wherein it is stated that such professional model is the employee of another employer covered by this chapter. For the purposes of this paragraph, the term "professional model" means a person who, in the course of his or her trade, occupation or profession, performs modeling services. For purposes of this paragraph, the term "modeling services" means the appearance by a professional model in photographic sessions or the engagement of such model in live, filmed or taped modeling performances for remuneration.

Notwithstanding any other provision of this chapter, and for purposes of this chapter only, a black car operator, as defined in article six-F of the executive law, [FN1] shall, on and after the fund liability date, as defined in such article, be an "employee" of the New York black car operators' injury compensation fund, inc. created pursuant to such article.

"Employee" shall not include, for the purposes of this chapter, the services of a licensed insurance agent or broker if it be proven that (a) substantially all of the remuneration (whether or not paid in cash) for the services performed by such agent or broker is directly related to sales or other output (including the performance of services) rather than to the number of hours worked; (b) such agent is not a life insurance agent receiving a training allowance subsidy described in paragraph three of subsection (e) of section four thousand two hundred twenty-eight of the insurance law; (c) the services performed by the broker or sales associate are performed pursuant to a written contract executed between such broker or sales associate and the person for whom the services are performed; and (d) the written contract provided for in clause (c) of this paragraph was not executed under duress and contains the following provisions:

(i) that the agent or broker is engaged as an independent contractor associated with the person for whom services are performed pursuant to article twenty-one of the insurance law and shall be treated as such for all purposes, including but not limited to federal and state taxation, withholding (other than federal insurance contributions act (FICA) taxes required for full time life insurance agents pursuant to section 3121(d)(3) of the federal internal revenue code), unemployment insurance and workers' compensation;

(ii) that the agent or broker (1) shall be paid a commission on his or her gross sales, if any, without deduction for taxes (other than federal insurance contributions act (FICA) taxes required for full time life insurance agents pursuant to section 3121(d)(3) of the federal internal revenue code), which commission shall be directly related to sales or other output; (2) shall not receive any remuneration related to the number of hours worked; and (3) shall not be treated as an employee with respect to such services for federal and state tax purposes (other than federal insurance contributions act (FICA) taxes required for full time life insurance agents pursuant to section 3121(d)(3) of the federal internal revenue code);

(iii) that the agent or broker shall be permitted to work any hours he or she chooses;

(iv) that the agent or broker shall be permitted to work out of his or her own office or home or the office of the person for whom services are performed;

(v) that the person for whom the services are performed may provide office facilities, clerical support, and supplies for the use of the agent or broker, but the agent or broker shall otherwise bear his or her own expenses, including but not limited to automobile, travel, and entertainment expenses;

(vi) that the person for whom the services are performed and the agent or broker shall comply with the requirements of article twenty-one of the insurance law and the regulations pertaining thereto, but such compliance shall not affect the agent's or broker's status as an independent contractor nor should it be construed as an indication that the agent or broker is an employee of the person for whom the services are performed for any purpose whatsoever;

(vii) that the contract and the association created thereby may be terminated by either party thereto at any time with notice given to the other.

"Employee" shall not include a media sales representative if it be proven that (a) substantially all of the compensation for the services performed by such media sales representative is directly related to sales or other productivity rather than to the number of hours worked; (b) the media sales representative must be incorporated under the laws of this state in order to be considered an independent contractor and shall be solely responsible for the payment of workers' compensation premiums; (c) the services performed by the media sales representative are performed pursuant to a written contract executed between such media sales representative and the person for whom the services are performed; and (d) the written contract provided for in subparagraph (c) of this paragraph was not executed under duress and contains the following provisions:

(i) that the media sales representative is engaged as an independent contractor associated with the person for whom services are performed and shall be treated as such for all purposes, including but not limited to federal and state taxation, withholdings, and workers' compensation;

(ii) that the media sales representative (A) shall be paid a commission based on a fixed fee rate outlined in the written contract, if any, without deduction for taxes, which commission shall be directly related to sales pursuant to price guidelines or other productivity within the sales area; (B) shall not receive any compensation related to the number of hours worked; and (C) shall not be treated as an employee with respect to such services for federal and state tax purposes;

(iii) that the media sales representative shall be permitted to work any hours he or she chooses subject to the restrictions in section three hundred ninety-nine-p of the general business law;

(iv) that the media sales representative may work at any site other than on the premises of the person for whom services are performed;

(v) that the person for whom the services are performed shall not be responsible for any reimbursement expenses other than those outlined in the written contract;

(vi) that the person for whom the services are performed and the media sales representative shall comply with all articles of the labor law that apply to such work other than article eighteen of the labor law, but such compliance shall not affect the media sales representative's status as an independent contractor nor shall it be construed as an indication that the media sales representative is an employee of the person for whom the services are performed for any purpose whatsoever; and

(vii) that the contract and the association created thereby may be terminated by the media sales representative thereto at any time with two weeks notice given to the person for whom the services are performed.

For the purposes of this subdivision, "media sales representative" shall include any contractor engaged in the sale or renewal of magazine subscriptions or the sale or renewal of magazine advertising space who (i) receives no direction or control on the methods by which they perform services other than training on product characteristics, (ii) are solely in control of their work schedule, and (iii) may refuse any work assignment.

5. "Employment" includes employment in a trade, business or occupation carried on by the employer for pecuniary gain, or in connection therewith, except where the employer elects to bring his employees within the provisions of this chapter as provided in section three, and except employment as a domestic worker as provided in section three, and except where a town elects to have the provisions of this chapter apply to the town superintendent of highways. "Employment" shall also include, in connection with the civil defense effort and for purposes of this chapter the service of a civil defense volunteer in authorized activities of a volunteer agency sponsored or authorized by a local office as defined in a state defense emergency act. [FN2] "Employment" shall also include participation with an auxiliary police effort made within a municipal corporation which elected to include auxiliary policemen within the definition of "employee" as authorized by subdivision four of this section and for purposes of this chapter, the services of members or volunteers in activities authorized by local law. The service of a civil defense volunteer who is also an employee recompensed

by an employer for service to such employer, shall not be deemed to be in employment of a local office when he is performing civil defense service in his employment or in relation thereto. For the purposes of this chapter only "employment" shall also include the delivery or sale and delivery of newspapers or periodicals by a newspaper carrier as defined in section thirty-two hundred twenty-eight of the education law. The term "employment" shall not include the services of a licensed real estate broker or sales associate if it be proven that (a) substantially all of the remuneration (whether or not paid in cash) for the services performed by such broker or sales associate is directly related to sales or other output (including the performance of services) rather than to the number of hours worked; (b) the services performed by the broker or sales associate are performed pursuant to a written contract executed between such broker or sales associate and the person for whom the services are performed within the past twelve to fifteen months; and (c) the written contract provided for in paragraph (b) herein was not executed under duress and contains the following provisions:

(i) that the broker or sales associate is engaged as an independent contractor associated with the person for whom services are performed pursuant to article twelve-A of the real property law and shall be treated as such for all purposes, including but not limited to federal and state taxation, withholding, unemployment insurance and workers' compensation;

(ii) that the broker or sales associate (A) shall be paid a commission on his or her gross sales, if any, without deduction for taxes, which commission shall be directly related to sales or other output; (B) shall not receive any remuneration related to the number of hours worked; and (C) shall not be treated as an employee with respect to such services for federal and state tax purposes;

(iii) that the broker or sales associate shall be permitted to work any hours he or she chooses;

(iv) that the broker or sales associate shall be permitted to work out of his or her own home or the office of the person for whom services are performed;

(v) that the broker or sales associate shall be free to engage in outside employment;

(vi) that the person for whom the services are performed may provide office facilities and supplies for the use of the broker or sales associate, but the broker or sales associate shall otherwise bear his or her own expenses, including but not limited to automobile, travel, and entertainment expenses;

(vii) that the person for whom the services are performed and the broker or sales associate shall comply with the requirements of article twelve-A of the real property law and the regulations pertaining thereto, but such compliance shall not affect the broker or sales associate's status as an independent contractor nor should it be construed as an indication that the broker or sales associate is an employee of the person for whom the services are performed for any purpose whatsoever;

(viii) that the contract and the association created thereby may be terminated by either party thereto at any time upon notice given to the other.

For the purpose of this chapter only, "employment" shall also include the service of a driver, operator or lessee of a taxicab as so defined in section one hundred forty-eight-a of the vehicle and traffic law, except where a person leases a taxicab from an owner-operator of a taxicab who, regularly operates the vehicle an average of forty or more hours per week. Such a lessee shall be deemed to be in employment if the lessor controls, directs, supervises, or has the power to hire or terminate the lessee.

Notwithstanding any other provision of this chapter, and for purposes of this chapter only, a jockey, apprentice jockey or exercise person licensed under article two or four of the racing, parimutuel wagering and breeding law performing services for an owner or trainer in connection with the training or racing of a horse at a facility of a racing association or corporation subject to article two or four of the racing, parimutuel wagering and breeding law and subject to the jurisdiction of the New York state racing and wagering board shall be regarded as in the "employment" not solely of such owner and trainer, but shall instead be conclusively presumed to be in the "employment" of The New York Jockey Injury Compensation Fund, Inc. and of all owners and trainers who are licensed or required to

be licensed under article two or four of the racing, parimutuel wagering and breeding law, at the time of any occurrence for which benefits are payable pursuant to this chapter in respect of the injury or death of such jockey, apprentice jockey or exercise person.

Notwithstanding any other provision of this chapter, and for purposes of this chapter only, a black car operator, as that term is defined in article six-F of the executive law, [FN1] shall, on and after the fund liability date, as that term is defined in such article, be regarded as in the "employment" of the New York black car operators' injury compensation fund, inc. created pursuant to such article.

"Employment" shall not include, for the purposes of this chapter, the services of a licensed insurance agent or broker if it be proven that (a) substantially all of the remuneration (whether or not paid in cash) for the services performed by such agent or broker is directly related to sales or other output (including the performance of services) rather than to the number of hours worked; (b) such agent is not a life insurance agent receiving a training allowance subsidy described in paragraph three of subsection (e) of section four thousand two hundred twenty-eight of the insurance law; (c) the services performed by the agent or broker are performed pursuant to a written contract executed between such agent or broker and the person for whom the services are performed; and (d) the written contract provided for in clause (c) of this paragraph was not executed under duress and contains the following provisions:

(i) that the agent or broker is engaged as an independent contractor associated with the person for whom services are performed pursuant to article twenty-one of the insurance law and shall be treated as such for all purposes, including but not limited to federal and state taxation, withholding (other than federal insurance contributions act (FICA) taxes required for full time life insurance agents pursuant to section 3121(d)(3) of the federal internal revenue code), unemployment insurance and workers' compensation;

(ii) that the agent or broker (1) shall be paid a commission on his or her gross sales, if any, without deduction for taxes (other than federal insurance contributions act (FICA) taxes required for full time life insurance agents pursuant to section 3121(d)(3) of the federal internal revenue code), which commission shall be directly related to sales or other output; (2) shall not receive any remuneration related to the number of hours worked; and (3) shall not be treated as an employee with respect to such services for federal and state tax purposes (other than federal insurance contributions act (FICA) taxes required for full time life insurance agents pursuant to section 3121(d)(3) of the federal internal revenue code);

(iii) that the agent or broker shall be permitted to work any hours he or she chooses;

(iv) that the agent or broker shall be permitted to work out of his or her own office or home or the office of the person for whom services are performed;

(v) that the person for whom the services are performed may provide office facilities, clerical support, and supplies for the use of the agent or broker, but the agent or broker shall otherwise bear his or her own expenses, including but not limited to automobile, travel, and entertainment expenses;

(vi) that the person for whom the services are performed and the agent or broker shall comply with the requirements of article twenty-one of the insurance law and the regulations pertaining thereto, but such compliance shall not affect the agent's or broker's status as an independent contractor nor should it be construed as an indication that the agent or broker is an employee of the person for whom the services are performed for any purpose whatsoever;

(vii) that the contract and the association created thereby may be terminated by either party thereto at any time with notice given to the other.

"Employment" shall not include the services of a media sales representative if it be proven that (A) substantially all of the compensation for the services performed by such media sales representative is directly related to sales or other productivity rather than to the number of hours worked; (B) the media sales representative must be incorporated under the laws of this state in order to be

considered an independent contractor and shall be solely responsible for the payment of workers' compensation premiums; (C) the services performed by the media sales representative are performed pursuant to a written contract executed between such media sales representative and the person for whom the services are performed; and (D) the written contract provided for in subparagraph (C) of this paragraph was not executed under duress and contains the following provisions:

(i) that the media sales representative is engaged as an independent contractor associated with the person for whom services are performed and shall be treated as such for all purposes, including but not limited to federal and state taxation, withholdings, and workers' compensation;

(ii) that the media sales representative (A) shall be paid a commission, based on a fixed fee rate outlined in the written contract, if any, without deduction for taxes, which commission shall be directly related to sales pursuant to price guidelines or other productivity within the sales area; (B) shall not receive any compensation related to the number of hours worked; and (C) shall not be treated as an employee with respect to such services for federal and state tax purposes;

(iii) that the media sales representative shall be permitted to work any hours he or she chooses subject to the restrictions in section three hundred ninety-nine-p of the general business law;

(iv) that the media sales representative may work at any site other than on the premises of the person for whom services are performed;

(v) that the person for whom the services are performed shall not be responsible for any reimbursement expenses other than those outlined in the written contract;

(vi) that the person for whom the services are performed and the media sales representative shall comply with all articles of the labor law that apply to such work other than article eighteen of the labor law, but such compliance shall not affect the media sales representative's status as an independent contractor nor shall it be construed as an indication that the media sales representative is an employee of the person for whom the services are performed for any purpose whatsoever; and

(vii) that the contract and the association created thereby may be terminated by the media sales representative thereto at any time with two weeks notice given to the person for whom the services are performed.

For the purposes of this subdivision, "media sales representative" shall include any contractor engaged in the sale or renewal of magazine subscriptions or the sale or renewal of magazine advertising space who (i) receives no direction or control on the methods by which they perform services other than training on product characteristics, (ii) are solely in control of their work schedule, and (iii) may refuse any work assignment.

6. "Compensation" means the money allowance payable to an employee or to his dependents as provided for in this chapter, and includes funeral benefits provided therein.

7. "Injury" and "personal injury" mean only accidental injuries arising out of and in the course of employment and such disease or infection as may naturally and unavoidably result therefrom. The terms "Injury" and "personal injury" shall not include an injury which is solely mental and is based on workrelated stress if such mental injury is a direct consequence of a lawful personnel decision involving a disciplinary action, work evaluation, job transfer, demotion, or termination taken in good faith by the employer.

8. "Death" when mentioned as a basis for the right to compensation means only death resulting from such injury.

9. "Wages" means the money rate at which the service rendered is recompensed under the contract of hiring in force at the time of the accident, including the reasonable value of board, rent, housing, lodging or similar advantage received from the employer, or in the case of (a) a civil defense volunteer, (b) a volunteer worker in a state department as provided in group sixteen of subdivision

one of section three of this chapter, (c) a volunteer worker for a social services district as provided in group seventeen of subdivision one of section three of this chapter, (d) a county fire coordinator, a deputy county fire coordinator or a comparable county official to whom the provisions of group fifteen-a of subdivision one of section three of this chapter are applicable, who is also a volunteer firefighter or ambulance worker, (e) a fire district officer whether elective or appointive and whether or not he is compensated for his services or a paid fire or ambulance district employee, (f) a state fire instructor whose compensation is paid in whole or in part by the state, (g) an enrolled member of a fire company who, is not a volunteer firefighter, receives compensation for his services and is not a full-time fireman, known as a "call fireman", (h) persons who are performing services for a public or not-for-profit corporation, association, institution or agency organized as an unincorporated association or duly incorporated under the laws of this state in fulfillment of a sentence of probation or of conditional discharge, or persons performing such services pursuant to the provisions of section 170.55 or 170.56 of the criminal procedure law, (i) an auxiliary policeman in a municipal corporation which elected to include such persons within the definition of "employee" as authorized by subdivision four of this section, or (j) a duly appointed member of a regional hazardous materials incidents team recognized under section two hundred nine-y of the general municipal law, such money rate applying in his regular vocation or the amount of the regular earnings of such volunteer, coordinator, instructor, or comparable officer, fire or ambulance district officer or employee or call fireman, or team member as the case may be, in his regular vocation, plus any amount earned as such a coordinator, instructor or comparable officer, or as such a fire or ambulance district officer or employee or call fireman or team member, provided, however, that in no event shall the average weekly wage be fixed at less than thirty dollars regardless of whether or not such volunteer, coordinator, instructor or comparable officer or fire or ambulance district officer or employee or call fireman or team member had gainful employment elsewhere at the time of the injury.

10. "State fund" means the state insurance fund provided for in article five [FN3] of this chapter.

11. "Child" shall include a posthumous child, a child legally adopted prior to the injury of the employee; and a step-child or child born out of wedlock dependent upon the deceased.

12. "Insurance carrier" shall include the state fund, stock corporations, mutual corporations or reciprocal insurers with which employers have insured, and employers permitted to pay compensation directly under the provisions of subdivisions three, three-a or four of section fifty of this chapter. For purposes of this chapter, a nonprofit property/casualty insurance company which is licensed pursuant to subsection (b) of section six thousand seven hundred four of the insurance law shall be deemed a stock corporation and a nonprofit property/casualty insurance company which is licensed as a reciprocal insurer pursuant to subsection (c) of section six thousand seven hundred four of the insurance law shall be deemed a reciprocal insurer.

13. "Manufacture," "construction," "operation" and "installation" shall include "repair," "demolition," "fabrication" and "alteration" and shall include all work done in connection with the repair of plants, buildings, grounds and approaches of all places where any of the hazardous employments are being carried on, operated or conducted.

14. "Minor" means a person who has not attained the age of eighteen years.

15. "Occupational disease" means a disease resulting from the nature of employment and contracted therein.

16. "New York state average weekly wage" shall mean the average weekly wage of the state of New York for the previous calendar year as reported by the commissioner of labor to the superintendent of insurance on March thirty-first.

17. A "substantially owned affiliated entity" of any person means the parent company of the person, any subsidiary of the person, or any entity in which the parent of the person owns more than fifty percent of the voting stock, or an entity in which one or more of the top five shareholders of the person individually or collectively also owns a controlling share of the voting stock, or an entity which exhibits any other indicia of control over the person or over which the person exhibits control,

regardless of whether or not the controlling party or parties have any identifiable or documented ownership interest. Such indicia shall include: power or responsibility over employment decisions; access to and/or use of the relevant entity's assets or equipment; power or responsibility over contracts of the person; responsibility for maintenance or submission of certified payroll records; and influence over the business decisions of the relevant entity.

18. The "special funds conservation committee" means the entity organized for the purpose of conserving assets of the special funds created under subdivision eight of section fifteen and section twenty-five-a of this chapter.

19. A "claim for reimbursement" from the special disability fund means an application to the board under paragraph (f) of subdivision eight of section fifteen of this chapter for a determination that the special disability fund is liable in the first instance for any reimbursement to the insurance carrier, self-insured employer or state insurance fund.

20. A "request for reimbursement" from the special disability fund means an application to the special disability fund for reimbursement for specific costs, subsequent to a determination by the board that the special disability fund is liable to provide reimbursement on the claim.

21. The "workers' compensation rating board" or the "New York workers' compensation rating board" shall mean the compensation insurance rating board until February first, two thousand eight, and thereafter such entity as is designated by law.

22. "Cost of compensation" means the amount that an employer must pay to secure compensation as calculated in accordance with regulation of the board or, in the absence of such regulation, based on average market rates for a comparable employer.

23. "Special disability fund advisory committee" shall mean an advisory committee to the workers' compensation board, acting by a majority thereof, solely with respect to the special fund entitled the special disability fund, composed of the director of the budget, the commissioner of labor, the commissioner of taxation and finance, the chair of the workers' compensation board, and the superintendent of insurance.

<u>AFFIDAVIT OF SERVICE</u>

STATE OF NEW YORK,
COUNTY OF NEW YORK ss.:

**DOROTA U. KUZNIAR-ZGLINSKA**, being duly sworn, deposes and says:

That deponent is not a party to this action, is over the age of 18 years and resides in QUEENS County in the State of New York.

That on December 6, 2007, deponent served the within AFFIRMATION IN OPPOSITION, MEMORANDUM OF LAW and EXHIBITS upon:

Katz & Rychik
Attorneys for Defendant(s)
METROPOLITAN OPERA ASSOCIATION, INC.
116 John Street
7th Floor
New York, NY 10038
(212) 766-4700

by depositing a true copy of the same securely enclosed in a postpaid wrapper in a Post Office Box regularly maintained by the United States Government at Madison Avenue and East 30th Street, New York, New York directed to the above mentioned attorneys at their respective address, that being the address within the State designated by them for that purpose upon the preceding papers in this action or the place where they kept an office, between which places there then was and now is regular communication by mail.

_____
**DOROTA U. KUZNIAR-ZGLINSKA**

Sworn to before me on
December 6, 2007

_____
Notary Public

YULIYA BLOKHINA
COMMISSIONER OF DEEDS
CITY OF NEW YORK
NO. 2-12193
COMMISSION EXPIRES APRIL 1, 20___09

22

Index No. 07CIV3778
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JEAN-PAUL FOUCHECOURT,

                         Plaintiff,

    -against-

METROPOLITAN OPERA ASSOCIATION, INC., and FRANCO ZEFFIRELLI,

                         Defendants.

AFFIRMATION IN OPPOSITION

**Budin, Reisman, Kupferberg & Bernstein, LLP**
*Attorneys for Plaintiff(s)*
*112 Madison Avenue*
*New York, New York 10016*
*212-696-5500*